<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| DANDANA, LLC,<br><br>                Plaintiff,<br><br>v.<br><br>MBC FZ-LLC d/b/a MBC Group a/k/a<br>Middle East Broadcasting Services,<br><br>                Defendant. | Civ. No. 08-5592 (DRD)<br><br><br>**O P I N I O N** |

*Appearances by:*

ROBERT FONTICOBA, ESQ.
750 Bergenline Avenue
North Bergen, New Jersey 07047

     *Attorney for Plaintiff*

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.
by:    John M. Agnello, Esq.
        Melissa E. Flax, Esq.
        Eric Magnelli, Esq.
5 Becker Farm Road
Roseland, New Jersey 07068

     *Attorneys for Defendant*

**DEBEVOISE, Senior District Judge**

This case arises out of a television distribution deal. Defendant MBC FZ-LLC ("MBC") is a producer and broadcaster of television stations of interest to Middle Eastern communities throughout the world. Plaintiff Dandana, LLC ("Dandana") is a television content distributor operating within the United States. In 2007 and 2008, Dandana entered into negotiations with MBC to assist it in placing stations on satellite television networks in North America. MBC later consummated a deal with such a network and licensed two televisions stations for broadcast on the DISH Network in the United States and Canada.

Plaintiff claims that MBC breached an oral revenue sharing agreement that it entered into before negotiations with DISH began. Plaintiff also seeks damages under unjust enrichment, *quantum meruit*, and fraud theories related to the same conduct. Defendant claims that there was no oral agreement and that it fulfilled its obligations under the parties' fully integrated written contract. Defendant now moves for summary judgment on all counts. Plaintiff moves to strike Defendant's Expert Witness.

For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED. Plaintiff's Complaint will be DISMISSED. Plaintiff's Motion to Strike is DENIED as moot.

## I.      BACKGROUND

Plaintiff Dandana, LLC ("Dandana") is a limited liability company incorporated and headquartered in New Jersey. (Def. Ex. 151, ¶ 3). Dandana was founded in 2004 by businessman Amro Al Tahwi ("Al Tahwi") and is entirely owned by Al Tahwi and his wife. (Def. Ex. 6, 31:19-32:7). Al Tahwi has been the Chief Executive Officer of Dandana for its entire existence. Id. at 33:9-13.

Dandana is a television content distributor. (Def. Ex. 6, 30:3-20). In this capacity

Dandana acts as an intermediary between the producers of English and Arabic language

television stations and the cable and satellite platforms that broadcast those stations in the United

States. Id. In some cases Dandana acquires ownership of entire television stations for long term

broadcast distribution. Id. at 29:14-25. In others it purchases the rebroadcast rights to television

stations for resale to cable and satellite providers. Id. at 30:7-13. Dandana also acts as an

advertising agency, selling targeted ad space on the ethnic channels that it redistributes. Id. at

30:15-20.

Defendant MBC FZ-LLC ("MBC") is a limited liability company formed under the laws

of the Free Zone, Dubai Media City, Dubai, United Arab Emirates ("UAE"). (Def. Ex. 1. ¶ 4).

MBC is a part of a larger constellation of companies (the "MBC Group") who broadcast satellite

television in the Middle East and North Africa region. (Def. Ex. 2 ¶ 4). MBC has broadcast

agreements with major European and American satellite and cable TV broadcasters, Hollywood

studios, and broadcasters in the Middle East. Id. MBC Group collectively employs 1500

employees and serves an audience of over 80 million viewers. Id.

For several years, programming produced by MBC[1] has been broadcast in the United

States to satellite subscribers of the Dish Network, LLC ("DISH").[2] MBC did not originally

contract with DISH directly. Instead MBC licensed the broadcast rights to its channels as part of

an arrangement with Arab Digital Distribution ("ADD"). In turn, ADD negotiated placement of

MBC channels on satellite providers in Europe, the Middle East, North Africa, and the United

---

[1]      While MBC produces a variety of content, the channels carried by DISH include MBC1
and Al Arabyia. The Memorandum of Understanding ("MOU") between MBC and ADD also
contains reference to a "CHANNEL 2" that was not part of the North American distribution plan.

[2]      Prior to 2007, DISH was a subsidiary of EchoStar LLC ("EchoStar"). The MOU makes
reference to "Echostar" or "Echostar Dish Network," but for clarity, DISH will be used
throughout the Opinion, regardless of the time period.

States. This arrangement with ADD was effectuated through a Memorandum of Understanding for Channel Licensing & Distribution Rights entered into between ADD and MBC on February 26, 2003. ("MOU") (Def. Ex. 7). The MOU granted ADD an exclusive license to MBC programming for a five year term running between February 26, 2003 and February 25, 2008. Id.

Discussions between Dandana and MBC began in mid 2007. In a May 8, 2007 email, Frederic Giaccardo, a former MBC consultant, introduced Al Tahwi to Mohammed Al Windawee ("Al Windawee"), the Head of Distribution for MBC. (Def. Ex. 10). Al Tahwi proposed that Dandana could take over for ADD in negotiating distribution of MBC channels over American satellite providers. (Def. Ex. 11). In particular, Al Tahwi suggested that MBC channels were poorly positioned and marketed among DISH channel offerings in the United States and were not promoted in Canada at all. Id. Al Tahwi suggested an arrangement through which MBC and Dandana would split licensing revenue and advertising profit generated through North American distribution 60%/40% respectively. Id.

After his initial pitch, Al Tahwi traveled to Dubai to meet with Al Windawee on July 29, 2007. (Def. Ex. 17). According to testimony from Al Tahwi, the meeting lasted a "couple of hours." (Def. Ex. 6, 104:14-22). The next day, Al Windawee sent Al Tahwi an email containing minutes summarizing the meeting. (Def. Ex. 18). The minutes show the Al Tahwi and Al Windawee had had extensive discussions concerning the scope and terms of a potential arrangement between Dandana and MBC. The details discussed including the number of channels to be licensed, the duration of the agreement, and a 70%/30% revenue sharing arrangement. Id.

Al Tahwi responded the same day. Taking Al Windawee's proposal point-by-point, he sent an email with detailed comments. (Def. Ex. 19). Al Tahwi agreed with many of the terms

suggested by Al Windawee, but took significant issue with others, such as the duration of the agreement and the geographic territory that it would cover. Id. He also noted that the agreement was not complete, stating that "I will have to negotiate with Dish once we sign our agreement." Id.

After Al Tahwi's response, the parties broke off communications and did not discuss terms for many months. Between July and December of 2007, Al Tahwi sent several messages to Al Windawee attempting to restart talks, but was told that Al Windawee was out of the office, or too busy to arrange to speak with him. (Def. Exs. 20-24). (Pl. SOF ¶ 38). On December 11, 2007, Al Tahwi sent another message to Al Windawee asking for a letter of representation addressed to DISH so that he could negotiate on behalf of MBC. (Def. Ex. 25). Al Windawee responded by email on December 23, 2007, stating that the parties still needed to "discuss and confirm some of the details" and that "we need to agree on the [revenue sharing] percentage with our CFO." (Def. Ex. 26). Al Windawee also provided some potential terms for further negotiation. Id.

Al Tahwi and Al Windawee spoke by telephone in early January 2008. In an email dated January 6, 2008, Al Windawee spoke of these discussions and informed Al Tahwi that he would be preparing a "temporary Authorization letter" that would enable Al Tahwi to negotiate with DISH on MBC's behalf. (Def. Ex. 27). Before he could provide such a letter, Al Windawee needed Al Tahwi to confirm a list of terms and provide Dandana's company registration information so that MBC could "accept your distribution proposal and consider it as an official offer…." Id.[3]

---

[3]    Plaintiff has produced a letter, allegedly sent on January 6, 2008, in which Al Windawee "officially confirm[s] that Dandana LLC is the sole distributor/agent for MBC channels in the United Sates[sic]." (Def. Ex. 29). Defendant has no record of this letter on its computer systems, and a subsequent analysis by Defendant's forensic expert concluded both: (1) that it was not produced by Al Windawee or MBC; and (2) that it did not appear on Plaintiff's computer systems until July 9, 2010, approximately one week after MBC served its document requests on

Al Tahwi responded the following day. (Def. Ex. 28). He complained about MBC's intransigence, writing that "the way you are structuring this will not protect me in the future nor is protecting the work I have done thus far" and "please understand my point here, I know I can negotiate the best deal for MBC and Al-Arabia, but I don't see any commitment from your end." Id. He noted that the revenue sharing details had not been decided, writing that "I also need to know what percentage you are offering our agency." Id. Al Tahwi repeated his request for an authorization letter and attached a certificate of incorporation for another of his companies, Sarasat Media Holding Inc. ("Sarasat").

Al Windawee sent Al Tahwi a draft authorization letter, which purported to permit Dandana to act as MBC's agent for distributing television channels in the United States. (Def. Ex. 31). However this letter contained severe restrictions of the scope of this agency, and did not permit Dandana to bind MBC to contracts with third parties. Id. Al Tahwi requested that Al Windawee modify this letter by placing the restrictions in an attached Exhibit, so that he could "use this letter without the Exhibit." (Def. Ex. 32). It appears that Al Tahwi wanted to represent to DISH that he had the authority to negotiate as MBC's agent while concealing the limitations of this authority. Id. However this approach, and the "authorization letter" concept was rejected by MBC's legal department. Id. Al Windawee communicated this message to Al Tahwi in an email dated January 8, 2008, and invited him to submit a formal bid for the distribution rights that legal could approve. Id.

Al Tahwi submitted a bid on January 13, 2008. (Def. No. 33). The bid proposed a 75%/25% revenue split along with a minimum revenue guarantee to MBC of $2 million per year. Id. After receiving the bid, Al Windawee asked that Al Tahwi come to Dubai to discuss the offer.

Dandana. (Def. SOF 11 at n. 5). While the Court will not rule on the legitimacy of this email and it does not change the result in this matter, it is troubled by the near certainty that evidence has been either manufactured or destroyed by one of the parties to this case.

(Def. No. 34). Al Tawhi agreed to come to Dubai, and requested that Al Windawee provide him with a formal bid invitation so that he could demonstrate the credibility of his position with DISH. (Def. Ex. 35). Al Windawee provided a formal bid request on January 28, 2008. (Def. Ex. 36.). Al Tawhi promptly forwarded this message to Tracy Thomson West ("Thomson West"), a Vice President at DISH. (Def. Ex. 37).

DISH was interested in carrying the MBC channels, so on March 2, 2008 Thomson West and lawyers for DISH met with MBC representatives at the MBC office in Dubai. (Def. Exs. 30, 232:10-22; 41). Al Tahwi attended as well and introduced the DISH representatives to his MBC contacts. Id. At this meeting, MBC and DISH came to an agreement under which MBC channels would be carried on DISH channels. (Def. Exs. 49, 50). Under the terms of the agreement, DISH would compensate MBC directly for the use of the channels and no "distributor" or "middleman" would be used. Id. However, on March 18, 2011 DISH signed an agreement with one of Al Tahwi's businesses to provide transmission services in connection with the distribution of cable channels from the Middle East to the United States. (Def. Ex. 51).

After the agreement between DISH and MBC, Al Tahwi began to press Al Windawee for the opportunity to do additional business with MBC. On March 3, 2008, he requested that the channels leased to DISH be included in Dandana's advertising portfolio. (Def. Ex. 61). On March 8, 2008 Al Windawee met with Al Tahwi to discuss potential new business ventures. (Def. Ex. 30, 246:2-6). However Al Windawee would not make a firm commitment to Al Tahwi concerning any potential business. In Al Tahwi's words, "he flipped-flopped on everything. He would… offer things, we're going to compensate you somewhere else, we're going to give you Canada a hundred percent, we're going to give you this, we're going to do that, just take this… he wouldn't even put [it] in writing sometimes…." Id. at 251:4-9.

This pattern of avoidance would continue. On March 10, 2008, Al Tahwi emailed Al Windawee to summarize their discussions and try to obtain an agreement in writing. (Def. No. 62). On March 16, 2008, he sent another message asking for an agreement in writing. (Def. No. 63). On March 19, 2008, Al Tahwi sent an additional message asking to find out the status of the discussions. (Def. No. 64). After some further back and forth about an Advertising Sales Agreement (Def. Nos. 66-68), Al Tahwi became frustrated at Al Windawee's continued intransigence. In an email dated April 7, 2008, Al Tahwi wrote to Al Windawee and Sam Barnett[4] at MBC, complaining that "[u]p until now I don't know where I am standing on our agreement below…." (Def. Ex. 69). Frustrated and angry, he threatened to sue MBC unless he received "what is due to me which is '30% for the duration of Dish contract'" and said that he "[was] not willing to renegotiate…."Id.

In an email sent the same day, Al Tahwi vented his frustrations to Thompson West at DISH, lamenting that despite preliminary negotiations with MBC in July of 2007 that "I didn't get an agreement signed because my priority was to get you in front of them right after the expiration of the IMD agreement." (Def. No 70). Al Tahwi further acknowledged that he "was wrong" to trust that MBC "would come through" and asked for help from DISH to "push[] them to close this issue…." Id.

Al Tahwi was mollified after a meeting with Al Windawee in Cannes on April 9, 2008. (Def. Exs. 30, 261:14-20, 74). He apologized for his previous message and said that he would "leave it up to [Barnett and Al Windawee]" to determine a "just and reasonable compensation…." (Def. Ex. 74). On April 12, 2008, Al Tahwi then followed up with a new proposal for a revenue sharing agreement in which MBC would pay Dandana 15% of revenues

---

[4]     Sam Barnett is the Chief Operating Officer and General Manager of MBC. (Def. Ex. 2, ¶ 2).

from DISH broadcast of one MBC station for one year, and 10% of revenues on two stations for

two additional years. (Def. Ex. 75).

When he was unable to move forward with MBC by May, Al Tahwi reached out to his

contact at DISH, Thompson West, in hopes that she could help broker a deal. (Def. Ex. 78). A

few days later, Al Windawee made a counter-proposal. Under the terms offered in Al

Windawee's May 5, 2008 email, Dandana would be given two lump sum payments of $200,000,

and percentages of United States and Canadian distribution revenues. (Def. Ex. 80). Al Tahwi

was not pleased with this offer (Def. Ex. 81), and when MBC dragged its heels on negotiating a

written agreement, he rejected it. (Def. Ex. 86). One the same day, Al Tahwi complained bitterly

to Barnett that Al Windawee was dishonest and had not dealt in good faith. (Def. Ex. 87).

At this point, Barnett took over negotiations and made efforts to salvage the deal. (Def.

Ex. 88). He assured Al Tahwi that MBC lawyers were working on a draft agreement and that Al

Tahwi would receive a share of revenue and two payments to compensate him for his services.

Id. On May 22, 2008, Barnett sent Al Tahwi a draft agreement promising Dandana $400,000 in

two lump sum payments plus future advertising and licensing revenues. (Def. Ex. 95). After

hammering out final terms in a conference call on May 27, 2008, Al Tahwi signed a final

agreement with MBC. The final agreement promised Dandana two $250,000 lump sum

payments, 70% of the advertising revenue generated from advertising on MBC's feed in the

United States, and a substantial share of the licensing revenue generated through distribution of

MBC's content in Canada, 100% for the first year, and then 70% the year after. (Def. Exs. 97-

99).

The May 27, 2008 Agreement contains several key provisions. First, it explicitly states

that the monies promised to Dandana are in compensation for Al Tahwi's aid in introducing

MBC to DISH.[5] Second, it contains a broad integration clause that makes clear that the May 27, 2008 Agreement supersedes any and all previous agreements concerning the subject matter of the contract.[6]

After signing the May 27, 2008 Agreement Al Tahwi promptly sent MBC an invoice for the first payment of $250,000. (Def. Ex. 100). Shortly thereafter, Al Windawee sent Al Tahwi the advertising Memorandum of Understanding so that the parties could finalize advertising sales in the North American market. (Def. Ex. 101). Al Tahwi and Barnett exchanged emails on June 18, 2008 in which Barnett promised to execute the agreement and send Al Tahwi the first payment. (Def. Exs. 102, 103). However on the same day, Al Tahwi sent a letter to the Chairman of MBC in which he complained about the way Barnett and Al Windawee had treated him and claimed that they had not been "honest" in their dealings. (Def. Ex. 105).

At this point, relations between Dandana and MBC began to further deteriorate. Apparently irritated by the letter to the Chairman, Al Windawee emailed Al Tahwi on June 19, 2008 and warned him to "think twice" before he "completely ruin[s] the relation that does not exist yet…." (Def. Ex. 107). He also noted that "MBC executives have shown great deal of tolerance to your way of communication, and I hope you appreciate that." Id. Four days later on June 23, 2008, Al Tahwi had his lawyer[7] send a letter to Barnett threatening suit if the first lump

---

[5]      "'The 'Services' shall mean the services that 'Company' shall provide to the 'MBC' under this Agreement which includes 'Company' introducing "MBC" to distribution operations in the Unites States for the purpose of distribution of the MBC Channels and therefore acting as an introducer between the 'MBC' and these distribution operations." (Def. Ex. 99).

[6]      "This Agreement supersedes all previous agreements, representations or promises and sets out all of the terms agreed between the parties. Any amendment or alteration to this Agreement must be in writing and signed by an authorized signatory of each party." (Def. Ex. 99).

[7]      The lawyer in question, Hamdi Rifai, has since been suspended from the practice of law in New Jersey. (Doc. No. 65). Mr. Rifai has a rather long disciplinary history. See, e.g., 204 N.J.

sum payment of $250,000 was not paid. (Def. Ex. 108). The payment was sent three days later on June 26, 2008. (Def. Ex. 112-113). Dandana admits that it received the payment and did not reject or return it. (Def. Ex. 114).

Throughout the summer, Dandana and MBC attempted to work out a sales agreement that would permit advertising to be placed on the MBC1 and Al Arabiya channels that DISH was broadcasting in the United States and Canada. (Def. Ex. 115-119). Beginning in September, DISH representatives began to express frustration that no advertising contract was forthcoming and no advertising had been placed. (Def. Ex. 120, 124). Al Tahwi and MBC blamed each other, but with some pushing from DISH, an executed agreement was brokered between MBC and SaraSat Media, another Al Tahwi media company. All parties received a copy of this agreement on September 19, 2008. (Def. Ex. 130). However no advertising was ever placed. The advertising agreement broke down almost immediately over a dispute concerning the proper advertising rate. (Def. Exs. 133-139). The parties broke off communication entirely by the end of September and did not speak to each other again until May of 2009. (Pl. SOF. 122).

On November 13, 2008, Plaintiff filed this lawsuit, seeking damages for breach of contract, unjust enrichment, and common law fraud. (Complaint ¶¶ 16-29) (Doc. No. 1). Plaintiff claims that it entered into an oral contract with MBC during the initial discussions between Al Tahwi and Al Windawee in Dubai on on July 29, 2007. It further claims that the contract required MBC to pay it 30% of gross revenues, and that MBC breached that agreement by failing to pay monies due. (Complaint ¶¶ 9, 12). A copy of this complaint was mailed to MBC in Dubai, but not properly served under the laws of the United Arab Emirates, which requires that all pleadings be served personally and in the native language (Arabic). Plaintiff obtained a default

---

592 (2011) (suspended for incivility and abuse of process); 171 N.J. 435 (2002) (reprimanded for gross neglect); 189 N.J. 206 (2007) (reprimanded for neglect and lack of diligence).

judgment against MBC (Doc. No. 10) which was subsequently vacated once MBC became aware of the case. (Doc. No. 20).

On May 28, 2009, MBC sent a letter purporting to terminate the advertising sales agreement with SaraSat, alleging that it was in material breach of the agreement. (Def. Ex. 140). Al Tahwi responded by letter, claiming that he had only "just been able to stop laughing at your claims" because he "hasn't executed the agreement" and therefore "isn't in material breach.") (Def. Ex. 141).

On the basis of these facts, Defendant now moves for summary judgment.

## II.     DISCUSSION

### A.     Standard of Review

Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Rule 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.

In a motion for summary judgment, the moving party has the burden of showing that no genuine issue of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, the moving party may discharge its burden by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine issue of fact exists and a trial is necessary.

Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a genuine issue of material fact and do not merely suggest "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

A party must support its assertions that a fact cannot be or is genuinely disputed "by (A) citing to particular parts of materials in the record…or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(c)(1). If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may…(2) consider the fact undisputed for purposes of the motion…." Rule 56(e).

In deciding whether an issue of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and determine the truth of the matter, but, rather, to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate.

The meaning of a contract may be decided by summary judgment where "the contract language is unambiguous and the moving party is entitled to judgment as a matter of law." Arnold M. Diamond, Inc. v. Gulf Coast Trailing Co., 180 F.3d 518, 522 (3d Cir. 1999).[8] However, to grant summary judgment, the court must "conclude that the contractual language is

---

[8]     In its papers, Defendant argues that New Jersey law should apply to the interpretation of this contract, as it is the law of the forum and is not in conflict with the relevant law of the United Arab Emirates. (Def. Br. 5-10). Plaintiff does not challenge this contention. As a consequence, the Court will look to the appropriate provisions of New Jersey law.

subject to only one reasonable interpretation." Id.; see also Tamarind Resort Associates v. Government of Virgin Islands, 138 F.3d 107, 111 (3d Cir. 1998) ("a contract is unambiguous if it is reasonably capable of only one construction").

Many of the issues facing the Court here involve the interpretation of an unambiguous contract. Consequently summary judgment is appropriate. The Court will examine each of the claims raised by Plaintiffs in turn.

### B.      Did the Parties Enter Into a Contract on July 27, 2007?

Plaintiff brings suit to recover damages for breach of contract struck during a July 27, 2007 meeting between Al Tahwi and Al Windawee. No written contract has been produced, and Plaintiff claims that the agreement was oral. (Pl. Br. 5).[9]

As a threshold matter, Plaintiff is required to submit evidence upon which a reasonable jury could conclude that the contract that it seeks to enforce actually exists. Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007) (breach claim requires "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."). While parties may contract orally, there can be no contract without "a manifestation of mutual assent by the parties to the same terms." Johnson & Johnson v. Charmley Drug Co., 11 N.J. 526, 539 (N.J. 1953). Indeed, "[w]here the parties do not agree to one or more essential terms…courts generally hold that the agreement is unenforceable." Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (N.J. 1992).

In support of its claim that Al Windawee made a binding and definite commitment on behalf of MBC on July 27, 2007, Plaintiff points to three documents. The first is an email sent by Al Tahwi on July 20, 2007 in response to proposed contract terms suggested by Al Windawee.

---

[9]      Citations to Plaintiff's brief are approximate, as Plaintiff's counsel neglected to include page numbers. Plaintiff's brief also lacks a table of contents or table of authorities as required by L. Civ. R. 7.2(b).

(Def. Ex. 19). In the email, Al Tahwi agrees with some of the terms and offers suggestions and counterproposals on the others. Id. The second is an email was sent by Al Tahwi to Al Windawee on December 23, 2007. (Def. Ex. 26). In the email, Al Tahwi says that "I think the time has come to move things forward, thus we need to discuss and confirm some of the details that I have listed below." Id. Al Tahwi then lists outstanding areas of negotiation and/or disagreement between the parties. Id. The third is a letter purporting that was allegedly sent by Al Windawee on January 6, 2008 in which he states that "Dandana LLC is the sole distributor/agent for MBC channels in the United States." (Def. Ex. 29).

None of these documents indicate that an enforceable agreement has been struck between the parties. The first two messages indicate that even after the July 27, 2007 meeting, negotiations were ongoing and that critical terms were still unresolved. Defendant claims that the third document is a forgery and has produced forensic evidence that suggests that it was not created by its purported author and was not sent on the date indicated on its face. But even if the document is genuine, it does not constitute a "manifestation of assent" by MBC to all of the essential terms of an agreement. It says nothing concerning the distribution of revenue between the parties, the term of the agreement, or the geographic limitations of Dandana's authority—all critical issues under negotiation according to the prior messages.

Moreover, the wealth of documentary evidence produced by the Plaintiff makes clear that even as late as January 2008, MBC was still soliciting formal offers from Dandana and was unwilling to provide an agency letter. (Def. Exs. 32-36). In the face of this unchallenged evidence, the Court cannot credit Dandana's incredible assertion that the parties had already come to agreement. Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

15

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

### C.   Does the May 27, 2008 Contract Supersede Prior Agreements?

But even if Dandana and MBC had made an agreement on July 27, 2007, a subsequent, unambiguous fully-integrated written contract between the parties concerning the same subject matter prohibits recourse to prior oral representations.

After months of bickering about the lack of a formal contract, on May 27, 2008, MBC and Dandana entered into a written agreement under which Dandana would be compensated for its role in brokering the licensing arrangement between MBC and DISH. This agreement contains an explicit integration clause that states:

> This Agreement supersedes all previous agreements, representations or promises and sets out all of the terms agreed between the parties.

(Def. Ex. 99).

This contract was executed by Dandana on May 27, 2008. In the days that followed, Dandana submitted an invoice that requested payment on the contract. Payment was made by MBC and accepted by Dandana on or about June 26, 2008. (Def. Ex. 114). While Plaintiff tries to claim that this payment was made pursuant to the July 27, 2007 Agreement, this is belied by its own invoice, which requested the $250,000 "Per MBC/Dandana LLC executed agreement dated May 27, 2008" (Def. Ex. 100). Moreover, counsel for Dandana acknowledged in his letter dated June 23, 2008 that the parties had come to a "subsequent agreement" concerning work done in connection with the DISH deal that was "accepted by my client…." (Def. Ex. 108).[10]

---

[10]   Plaintiff also argues that the May 27, 2008 agreement "was already invalid" when it received the $250,000 payment because the payment was late. (Pl. Br. 2). Plaintiff cites no language in the contract which supports such a proposition. The termination provision of the June 27, 2008 agreement provides that the agreement will terminate only if a party commits a serious breach and fails to cure that breach within 15 days of receiving written notice of the

While New Jersey law permits this Court to consider extrinsic evidence "in determining the intent and meaning of the contract" this evidence cannot be used "to vary the [written] terms of the" agreement. <u>Conway v. 287 Corporate Center Associates</u>, 187 N.J. 259, 269-270 (2006); <u>see</u> <u>also</u> <u>City of Orange Tp. v. Empire Mortg. Services, Inc.</u>, 341 N.J. Super. 216, 224 (App. Div. 2001) ("where the terms of a contract are clear and unambiguous there is no room for interpretation or construction and the courts must enforce those terms as written."); <u>Filmlife, Inc. v. Mal "Z" Ena, Inc.</u>, 251 N.J. Super. 570, 575 (App. Div. 1991) ("oral misrepresentations" that are "contradictory of the undertakings expressly dealt with by the writings, are not effectual in that circumstance to avoid the obligation [plaintiff] knowingly assumed."). Enforcement of a prior deal is barred by the parol evidence rule and the explicit language of the May 27, 2008 agreement.

Plaintiff has no produced no credible evidence of a July 27, 2007 oral contract. Even if it had, the subsequent written agreement prevents recourse to prior negotiations that would alter its terms. Consequently, the Court finds that there was no July 27, 2007 contract between Dandana and MBC. Plaintiff's breach of contract claim is DISMISSED.

### D.    Unjust Enrichment

"To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust." <u>VRG Corp. v. GKN Realty Corp.</u>, 135 N.J. 539, 554 (N.J. 1994). However quasi contract theories like unjust enrichment "cannot exist when there is an existing express contract about the identical subject. The parties are bound by their agreement." <u>C. B. Snyder Realty Co. v. National Newark & Essex Banking Co. of Newark</u>, 14 N.J. 146, 163 (1954); <u>see</u> <u>also</u> <u>Suburban Transfer Service, Inc. v.</u>

---

default. (Def. Ex. 99). Plaintiff's notice letter concerning the late payment was sent on June 23, 2008, (Def. Ex. 108) and the payment was received four days later. (Def. Ex. 114).

17

Beech Holdings, Inc., 716 F.2d 220, 226 -227 (3d Cir. 1983) (unjust enrichment inappropriate where "an express contract exists concerning the identical subject matter."). Where a contract exists governing the alleged benefit "[t]he parties are bound by their agreement, and there is no ground for implying a promise as long as [the] valid unrescinded contract governs the rights of the parties." Id. at 227; see also Avatar Business Connection, Inc. v. Uni-Marts, Inc., No. 04-1866, 2006 WL 1843136, *6 (D.N.J. June 30, 2006) ("it is well-established that where a valid express contract exists, claims of quantum meruit and unjust enrichment do not.").

Plaintiff's acceptance of the May 27, 2008 contract forecloses recovery on claims sounding in quasi-contract theories such as unjust enrichment or *quantum meruit*. Tellingly, Plaintiff does not even attempt to defend this cause of action in its brief. Plaintiff's unjust enrichment/*quantum meruit* claim is DISMISSED.

### E.    Fraud

"A plaintiff asserting a claim of common-law fraud must establish: '(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereupon by the other person; and (5) resulting damages.'" Stoecker v. Echevarria, 408 N.J. Super. 597, 618 (App. Div. 2009). Under Rule 9(b), "a plaintiff alleging fraud must state the circumstances of the alleged fraud with… particularity" and "plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007).

Plaintiff did not properly plead fraud in its complaint, and it has marshaled no evidence in support of it in respond to Defendant's motion for summary judgment. To the extent that

18

Plaintiff makes general averments of dishonesty in MBC's dealings, they are entirely duplicative of already dismissed contract claims. Plaintiff's fraud claim is DISMISSED.

### III.   CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment is GRANTED. Plaintiff's Complaint will be DISMISSED. Plaintiff's Motion to Strike is DENIED as moot.

s/ Dickinson R. Debevoise
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: November 7, 2011